OEA, OEA, OEA. All persons having business before the Honorable United States Court of Appeals, please discuss the following assertions. I remind, lobbyists, and give their opinions before the Court of Appeals, that of the United States, and of all the courts. Please be seated. Case number 13-5336, Torrance Jones, Appellant v. Executive Office for United States Attorneys. Ms. McDonough for the amicus curiae, Mr. Hudak for the appellee. Judge Tatel, my name is Stephen Goldblatt. I am a professor of law at Georgetown University Law Center, and I was appointed as an amicus in support of Mr. Jones in this case. With the court's permission, argument today will be presented by Sarah P. McDonough, a third-year law student at Georgetown who is appearing in conformity with the rules of this court. Fine, thank you. Thank you. She may proceed. May it please the court. I'd like to focus my argument today on whether it was reasonable for the government to end its search because a criminal trial file was empty. The district court's conclusion that the search was reasonable was based on the government's generalized claim below that because the file was purged, the government no longer possesses the documents. Do you have any knowledge of what purged means? No. It's not clear on this record what purged means and whether – and purged does not mean necessarily that the requested documents were destroyed. It's not clear to us whether – it's not clear on this record whether the documents might have fallen into an exception to the purging policy or might simply be stored elsewhere. The government's generalized claim on the district court's record that the documents – that the file was purged does not explain that their search was reasonable. Why is that a generalized claim? Because there's – because the government relies on a purging policy but fails to provide the policy. So the court does not have enough information. Well, one of the reasons that the court – the district court didn't have is because the – that issue was never raised in the district court. Mr. Jones raised – Mr. Jones – He never – he never complained about the statement that the file was purged and stripped. He – So that's one explanation for why we don't have any information about that, because it wasn't litigated. But Mr. Jones was a pro se litigant and he did argue – So why – why does that matter? Well, he – there is a lower standard for what he needs to point out, and he pointed out several times that the record was not sufficient to establish that the government had performed a reasonable search, including because the government did not search its former record system and did not contact AUSA Hamilton, who prosecuted Mr. Jones's case. Without – the government is required to establish that it pursued all of the obvious leads in the record, and on this record it hasn't done so. In fact – The documents sought, according to the FOIA request, were statements of, what, six individuals, right? We know that Sinclair at least indicated that the agents that were doing the interviewing were not federal agents. They were North Carolina police officers, two of them. We know Sinclair – they were taking notes, and Sinclair said they tore them up at the end of his interview, so that would explain that. We also know there was no statement by one of the other individuals, a gentleman named Mann. And the reason we know that is because the Fourth Circuit so held. Now, notes taken by a state police officer are not statements of the individuals being interviewed unless the individual adopted them or they were typed out and signed them in some way. So how do we even know that there were any statements at all? Under the Jenks Act, the statement is defined as, you know, what I just said, right? A witness statement. Yeah, and there were other individuals within the FOIA request that testified at trial, right? Now, the usual practice for a defense counsel is to file a blanket Jenks Act motion. No documents were turned over, which indicates – it's a pretty strong indication that there were no statements by any of these individuals. If the government wants to rely on the argument that the documents don't exist, then the government needs to show that it performed a reasonable search to identify whether the documents existed in any of the obvious places where they would have existed. The obvious place for the notes of the two North Carolina police officers, the obvious place would be in the North Carolina police file. And it's possible that the Raleigh Police Department acted as a custodian for those documents. That's why we suggested that it's important for the government to submit the policy for its recordkeeping on the record in order to overcome the generalized claim rule in Valencia, because it's possible that a prosecutor's office has made an arrangement with the Raleigh Police Department that initiated the investigation in order to preserve important documents. On appeal, the best argument that the government can muster to explain the absence of these documents is that a purging policy is a, quote, possible logical explanation for their absence. That's not enough to establish that there was a reasonable search. Under Valencia, a, quote, generalized claim of destruction or non-preservation cannot sustain summary judgment. And here, we don't even have a generalized claim of destruction or non-preservation. We only have a possible logical explanation for the document's absence. Well, we don't have any indication there were such statements to begin with. So if there were no witness statements at all, then it doesn't matter whether there was a purge or a strip because there were no documents that were purged. Well, we know that the U.S. Probation Office ultimately relied on the witness statements. So it's reasonable to think that the... I think the indication is that there weren't statements. They were relying on the notes of the either by... Do we know whether the police officers were interviewed by the probation office? Do we know that the... We don't know. We don't know on the record whether the police officers were interviewed by the... They might have... The officers might have given them copies of their notes, or they might have sat down with the probation office people and read from the notes, and the probation people went and wrote them down. But either case, the probation office is not an arm of the U.S. Attorney's Office, is it? No, but if the probation office relied on the witness statements, and if I understand your question earlier correctly, it's whether the witness statements ever existed at all. So if the U.S. Probation Office relied on them, then we know that they once existed. No, it's totally consistent. The material in the pre-sentence report is totally consistent with the absence of any witness statement. And the reason is because the... That information could have been contained and probably was contained in the police officers' notes that they took. And we know that they were taking notes because that's what happened with Sinclair. We know there was no statement because the Fourth Circuit so held with respect the man. By the way, do you have any explanation about why, in the trial appeal, that the Jenks Act was invoked, or an allegation of the Jenks Act being violated, was put forward only with respect to man? What about the... I can understand Sinclair, but what about the four other people? I'm not sure I'll have to respond on rebuttal to the difference between man and the other co-defendants. Is there a... In the file in this case, are there copies of the briefs in the Fourth Circuit appeal? I'm not sure I will respond on rebuttal. But the government... It's the government's burden to establish that if these documents were never in the government's possession, or that they were... that they never existed, then the government has searched all of the places that are likely to contain the documents. And on this record, the government hasn't done so. This system called Lyons, is that what it's called, Lyons? Yes. Is that just like an index? Do you know what it is? I believe it's a... It doesn't contain documents, does it? Correct, it doesn't contain documents. It contains a... it indicates what files the paralegals should go to to search for documents. So I imagine it to be similar to a Dewey Decimal System, where it's a map that lays out where the files are later located. So if they found... And are you arguing that the government should also search the predecessor system? Yes, because Mr. Jones' case was initiated in the predecessor system. But we know that that system was merged into the new system, and they found documents in the new system. Why would they need to look at the old system? Because it's not clear that... it's not clear what happened in the migration. There was... Mr. Jones' case, according to two declarations on the record, was purged and closed on January 28, 1997, when he was... on the date of sentencing. And then another declaration says that his case... because his case was pending, it would have been migrated to the new system. But it's not clear that his trial file was migrated or that... it's unclear what was pending and what was migrated on this record. And if the file was purged and closed, even assuming that the trial file was purged and closed, that doesn't explain that the documents are not located elsewhere. Okay. Okay, thank you. Thank you. Thank you. Good morning, Your Honors. Brian Hudak from the U.S. Attorney's Office on behalf of EOUSA. May it please the Court. This Court should affirm because EOUSA's search here was reasonable, because no records were found, no assessment of exemptions is needed on this appeal. EOUSA searched the tracking system that existed for the criminal case files that would have contained these statements if they were at all contained in EOUSA's system. That's assuming everything worked as it should have worked, right? I don't think there's that assumption, Your Honor. I think the record bears out that the migration worked. Well, this migration bears out that their portion migrated. It doesn't establish that everything migrated. Your Honor, I was – I mean, I understand that in a sense that's hard to prove. On the other hand, it's also incredibly easy to verify whether anything's left and promised, at least I assume it is, by looking at a promise. Well, Your Honor, I would say two responses. One, I think that the record bears that the tracking information for the case was successfully migrated, because when searching for Joseph's – What do you mean by migrated? My understanding is Lyons and Promise are tracking systems, at least my experience with them, is that they contain kind of bibliographic information about the case, the case name, the court number, the assigned attorney, when it was assigned, what type of case it is for statistical reporting purposes. And then it also has a section that has links, pointers, to physical case files. And I think relevant here is that pointer to physical case files. And what we know is that they searched Lyons and that they discovered entries for the criminal case file with the corresponding appellate file and a separate appellate file. I believe Mr. Jones had a collateral challenge. And so it had entries for each of the cases, the actions that were pending regarding Mr. Jones. And then it also had the pointer information to allow a paralegal to go to the records room and pull out the files, which she did. We know that from the declaration. That doesn't answer the question whether everything in the predecessor file actually migrated, does it? You just told us what's in Lyons. But the question is, what was the predecessor thing called? It was either Promise or U.S. Acts. Unless you look at those, how do you know that there wasn't something there that didn't get, quote, migrated? Well, Your Honor, we don't know for a certainty that something didn't get migrated. I will agree with the Court on this record. We don't know that as a certainty. But there is no, as Kowalczyk put it, there is no obligation to have certainty. The agency only needs to pursue leads that it cannot in good faith ignore, that is, a lead that is both clear and certain. And if it goes to the tracking system that it uses, sees entries that were migrated and should have been migrated because this appeal was pending at the time the migration took place, sees entries, sees pointers to the physical case files, pulls those case files, and indeed they still existed. The Redwells or boxes or whatever, they were contained and still existed. They still have file folders in them. And search those for the witness statements. I don't recall the case using the phrase clear and certain, but I know there are plenty of cases that require search even though it has much less than a guarantee of actually yielding anything. Right? Yes, Your Honor. There's an implicit and sometimes explicit balance of the burden of the incremental search and the probability of finding something. And at least from what the brief says and what you said, the burden of this particular incremental search seems to be almost invisible. Well, I don't think the record is clear on what the burden would be, Your Honor. And I think that, you know, I think the – Well, you know, you people know that. Yes, Your Honor. And if the question turns on whether the search of promise would be a burden, I think the record reveals that it may be. The current management, the systems information management in the Eastern District of North Carolina, didn't even know what the predecessor system was. That's because the migration occurred over 20 years ago. To go back to such a legacy system for information, when the information appeared to be ported into the new system, the information is there. Do you know whether the system even exists now? Your Honor. I mean, it would seem odd to me that you have a computerized system that's overtaken by a more modern system that you could still go back and pull up material on the old system. Your Honor, I think that there is that possibility. But I think we run into, for example, in civil discovery all the time, we run into situations where legacy systems become increasingly difficult to access with evolving technology because they were based upon formats or other things that became difficult. Or floppy disks. Or data degradation. Yeah. There's a whole host of reasons why legacy systems, especially systems that are now almost 20 years old, would have practical burdens to go back and search. But I would agree with the Court that the record is not there as to what the burdens are because the district court didn't believe that that was necessary to establish reasonableness of the agency search. And, again, that's what it is. Yes, Your Honor. So, Amicus points out that there's a conflict here between the Zeyer statement, which says that the file was closed in January 1997, and Hyatt's affidavit said it would have been opened and pending in September or October 1997 and thus migrated to Lyons. Yes, Your Honor. I believe that it was closed when the district court case concluded. And then there was 30, 45 days later, Mr. Jones instituted his appeal, and those cases went pending again. Wasn't it closed and purged after his trial? Yes, Your Honor. That word, I would agree, hit the record. Isn't that word odd? Yeah. For, I mean, I know you're confident, U.S. Attorney's confident in the results of its cases, but there are appeals. And sometimes it loses and they need those rights. So what does that mean? Your Honor, I would agree. Judge Randolph asked that same question of my colleague on the other side. And I would say that the record is not exactly clear as to what the term purged means. But I think we know what it doesn't mean. It doesn't mean that the files were completely destroyed, because they were able to gather the files, the physical files, and review them. And there is in the record indications that file folders continue to exist in those folders and that the contents were reviewed. So there was substance to these files, not just merely shells of a red well. So I think later on in desire declaration, it adds another verb that I think may be helpful, although the exact parameters of what was done remain unclear from the record. It was stripped in accordance with office policy. What exactly the policy was or what exactly the exact contours of what should have been removed, what wasn't removed, what needed to be preserved for appellate purposes or subsequent trials, I'm not exactly sure. But it provides a logical explanation. And it was never litigated in the district court because nobody challenged or Mr. Jones never challenged that that was a non-issue. Yes, Your Honor. Exactly. The issue wasn't fully developed in the record before the district court. But also, Your Honor, it provides a logical explanation. And I think the reason that it was noted in these affidavits provides a logical explanation that if the steamers did exist ever in EOUSA's custody, which is not a foregone conclusion in the first place, that they may not exist anymore. I mean, that there is a logical explanation why they don't exist anymore in that file. But getting back to the— What we have, would you agree, from the information that's contained in this record, the indications are there were no steamers. There were notes by North Carolina police officers, but that's it. I would agree, Your Honor. I think that the word statement is imprecisely used in certain documents in the record. I don't believe there are any JANXAC statements. In fact, the Fourth Circuit held, at least with regard to one person, that there wasn't. And none were turned over in the district court action. And the prosecutor on the record stated that she was unaware of any JANXAC material for one particular witness. That's at Joint Appendix 30 when a certain witness— Was that the man? I believe that was a man, Your Honor. It's unclear from the record exactly who she is. Just to be clear, is your argument that the FOIA duty, both to search and to turn over, depends on these documents being JANX material? No, Your Honor. I didn't think so. No, Your Honor. But it paints the reasonable picture here, and it fills in the facts as to why these notes may not have been in the criminal prosecutor's file. Yes, I understand that. Because if investigators have notes that aren't JANXAC or require criminal disclosures, there's logical reasons why they want to be in the criminal prosecutor's file. I understand. And I'll just point out one more record citation. One of the—is it correct that one of the North Carolina police officers who did the interviews, and there were two of them, and they did the interviews together, but one of them, in fact, testified at the trial? I—Your Honor, I'm not certain on that. I would assume that a police officer or the investigating agent is going to testify at a trial with a criminal defendant. No, I think the record indicates that one of them did testify. Would the notes that that officer took during the interview constitute JANX material? No, Your Honor, because unless there are somewhat verbatim—and again, the precise standard I don't have in front of me, but unless they're somewhat verbatim or have been adopted by the criminal defendant or the— It might not be JANX material for the officer. They— In other words, he's purporting to give an account of what somebody said, and that might be used to impeach what he says on the stand, the person said, if he did. If he did. I think it depends on what he testified to, and I think it depends on what the notes say. Certainly none of that is in the record, but what is in the record is the probation office and further indication that EOUSA may not have ever had these notes, is that the probation office, when it asked for notes regarding Mr. Mann at Joint Appendix 33 in the probation office's response to objections that Mr. Jones made, it notes that in regard to the existence of Mann's statement— and again, I think they're using the word statement here loosely to mean notes— the probation officer obtained this statement from the investigative agents. He didn't go to the prosecutor to get this. He went to the investigative agents because they are the ones that conducted the interviews. They are the ones with the notes. And again, the records of the State of North Carolina aren't in the custody of EOUSA for purposes of FOIA. So what about Hamilton? Why not ask her?  I agree that the most logical question that pops up with a FOIA case 20 years after a criminal prosecution is whether she's with the office, and the record is unclear on that. We're happy to supplement the record in additional research. We believe that she's in private practice in West Virginia. But moving closer on is that the requirement to go and talk to a government employee hinges on the test where it's someone with a close nexus to the documents. Well, she tried the case, didn't she? Yes, Your Honor. She has a close nexus. That's a pretty close nexus. Close nexus to the case. Yeah. But close nexus to the notes? She didn't take the notes? There's no evidence in the record that she attended the interviews? There's no evidence in the record that she ever had the notes? Where does this requirement come from, this close nexus to the document? Where in FOIA does that come from? Your Honor, I don't think it's in the text of FOIA. It's in the precedent of this court and Valencia-Lucena. And I think the facts— Has it ever been adopted by any other court? Or have we relied on that? I believe Valencia-Lucena is often cited in FOIA cases. I do not know— But for other propositions? For other propositions. I would say that, you know, whether it's in the holding of this court in subsequent cases after Valencia-Lucena— There are reports that the government is getting now more than 700,000 FOIA requests a year. How many does the Executive Office of U.S. Attorneys get? Do you know? I think it's in the hundreds of thousands, Your Honor, because of the close connection between the U.S. Attorney's offices and criminal prosecutions where a lot of FOIA requests arise for subsequent challenges. Anything else? Anything else, Your Honor? No, we asked the— Thank you. The United States asked that the district court judgment be affirmed. Thank you, Your Honor. Thank you. Ms. McDonough was out of town, right? Out of time. You, Ms. McDonough, you can take two minutes if you'd like it. I think there were some things you were going to tell us on rebuttal also. Yes, Your Honor. First, the government has claimed no waiver, including in their brief. And it's inappropriate for the government to provide so much information on appeal in order to sustain an order granting summary judgment below. Second, there was no claim that the documents never existed. And, in fact, in the government— Has the government actually provided information on appeal? I didn't see that. I mean, I— Well, the government— And I agree it would be wrong to rule on the basis of facts that turned up only on appeal. But are there any? Well, the government did submit a declaration, the Curtis Declaration, as an addendum to its brief. Okay. Could you go back to your—what was your second point? You said there's no—what were you about to say? That the government accepts that the documents once existed. On page 23 of their response brief, the government accepts that the documents existed and that their search didn't turn up the documents after they performed a search of the Lyons system. But it's the government's burden to establish that they searched all of the places that are likely to— In other words, your point is they never claimed they didn't exist. Exactly. Did they ever—did the government ever conceive that whatever the documents were, if they were police officer notes, that they were contained in a U.S. government file? I don't think so. I'm not sure, Your Honor, but I— That's the question. I don't think it makes a difference. The issue is whether the government performed a reasonable search in order to find the documents. And on this record, the government has not established that it searched all of the places likely to turn up the documents. The record—if the government doesn't want to contact AUSA Hamilton, then the government needs to establish that contacting her would be a burden or unfruitful. But the government hasn't done that on this record, and the record isn't clear about where she works. In general, this record is not enough to establish that they have— Well, what would happen if we—if it goes back to the district court and they submit an affidavit saying she no longer works for the government? Then what? Then one person who we argue the government should have contacted, then they would clear up that one question. But on this record, there are a number of open questions about how far the government should have searched and how far they did search, and that shouldn't have—that's insufficient to support summary judgment. I see. Well, thank you. Thank you. Ms. Smith, you were appointed by the court as amicus, and we're grateful to you and your colleagues for your assistance. Thank you.
judges: Tatel, Williams, Randolph